MARTIN–MARIETTA CORPORATION,
Plaintiff-Appellant,

v.

BENDIX CORPORATION, et al.,
Defendants-Appellees.

UNITED TECHNOLOGIES,
Plaintiff-Appellant,

v.

BENDIX CORPORATION, et al.,
Defendants-Appellees.

Nos. 82–1677, 82–1678.

United States Court of Appeals,
Sixth Circuit.

Argued Sept. 22, 1982.

Decided Sept. 22, 1982.

John C. Elam, Vorys, Sater, Seymour & Pease, Columbus, Ohio, Theodore Souris, Bodman, Longley & Dahling, Detroit, Mich., Robert B. Mazur, Wachtell, Lipton, Rosen & Katz, New York City, for United Technologies.

Russel H. Beatie, Jr., Dewey, Ballantine, Bushby, Palmer & Wood, New York City, Leslie W. Fleming, Butzel Long Gust Klien & Van Zile, Detroit, Mich., for Martin-Marietta Corp.

James K. Robinson, Stephen Wasinger, Detroit, Mich., for Bendix Corp.

Joe D. Sutton, Lansing, Mich., for Michigan defendants-appellees.

Before ENGEL, KEITH and KENNEDY, Circuit Judges.

CORNELIA G. KENNEDY, Circuit Judge.

Appellants Martin-Marietta and United Technologies appeal a decision of the District Court refusing their request for a preliminary injunction against the enforcement of the anti-fraud provisions of the Michigan Take-Over Offers Act, Mich.Comp.Laws Ann. §§ 451.901–917, and the Michigan Uniform Securities Act, Mich.Comp.Laws Ann. §§ 451.501–818, on the grounds that the issuance of an injunction is prohibited by the Anti-Injunction Act, 28 U.S.C. § 2283, and the abstention doctrines, and because appellants have not satisfied the prerequisites for the issuance of a preliminary injunction. Appellants had alleged in their actions for declaratory and injunctive relief that the entire Take-Over Offers Act and, more particularly, the anti-fraud and enforcement provisions of both the Take-Over Offers Act, id., §§ 451.910, .914, .917, and the Uniform Securities Act, id., §§ 451.501, .808, violated the Commerce and Supremacy Clauses of the United States Constitution in that they regulated interstate take-overs, conflicted with the Williams Act, 15 U.S.C. §§ 78m(d)–(e), 78n(d)–(f), and imposed a burden on interstate commerce that was excessive in light of the local interests purportedly protected by the provisions. 42 U.S.C. § 1983, 28 U.S.C. §§ 1331, 1337, 1343, 2201.

The present actions, consolidated for expedited appeal, arise out of the tender offer battle among appellants Martin-Marietta and United Technologies and appellee Bendix Corporation. The four state appellees are Kelley, the Michigan Attorney General, Berman, the Director of the Michigan Department of Commerce, Mackey, the Director of the Corporation and Securities Bureau and Patterson, the Prosecuting Attorney for the County of Oakland, Michigan. These individual appellees are responsible for the enforcement of the two Michigan statutes which are at issue on this appeal.

On August 25, 1982, Bendix announced a nationwide tender offer for up to 48% of the outstanding shares of Martin-Marietta for $42 a share. The terms of this offer were subsequently amended to permit it to acquire 54% of Martin-Marietta's shares at $48 a share.

Martin-Marietta contemplated a counter tender offer to acquire a controlling inter-

est in Bendix. Prior to announcing its tender offer, Martin-Marietta contacted Mackey, the Director of the Michigan Corporation and Securities Bureau and was informed by him that the anti-fraud provisions of the two Michigan statutes at issue were applicable to the proposed tender offer and that Martin-Marietta would be required to comply with these provisions. Martin-Marietta was advised that it was required to file with the Bureau all the materials that were required under the Williams Act. Without having complied with these provisions, Martin-Marietta commenced a tender offer on August 30, for approximately 50% of the outstanding shares of Bendix at $75 per share. Only about 5% of Bendix stock is owned by Michigan residents, although there is some suggestion in statements of Martin-Marietta's counsel before this panel, before the District Court and in its briefs that some Michigan employees of Bendix are beneficial owners of stock in an employees stock option plan which is administered in New York. The same day Martin-Marietta's tender offer was announced, it filed suit in the United States District Court for the Eastern District of Michigan seeking declaratory and injunctive relief against the enforcement of the Michigan Take-Over Offers Act in conjunction with its interstate tender offer.[1] The District Court refused Martin-Marietta's request for a temporary restraining order that same day and scheduled a hearing on the motion for a preliminary injunction for September 2. At the September 2 hearing, the District Court denied Martin-Marietta's request for injunctive relief on the ground that Martin-Marietta had failed to make the requisite showing of threatened irreparable harm and Martin-Marietta had not demonstrated probable success on the merits of its claim that the Take-Over Offers Act was totally invalid. On September 3, the Bureau notified Martin-Marietta that it would enforce the anti-fraud provisions of the Take-Over Offers Act and gave Martin-Marietta forty-eight hours to secure compliance with its disclosure provisions which Martin-Marietta did not do.

On September 7, United Technologies, in cooperation with Martin-Marietta, commenced a tender offer for Bendix stock. United Technologies filed under protest a copy of its tender offer materials with the Bureau, expressly reserving its rights without prejudicing or waiving its claim that the Take-Over Offers Act was unconstitutional. The same day as the announcement of the tender offer and the filing under protest, United Technologies brought suit in the same District Court seeking declaratory and injunctive relief on identical grounds as Martin-Marietta. In the absence of the District Judge handling the Martin-Marietta suit, a request for a temporary restraining order was presented to the presiding judge who refused the request but scheduled a preliminary injunction hearing before the original judge on September 9. On September 9, the preliminary injunction hearing was adjourned and rescheduled for September 17. On the afternoon of September 9, the Michigan Corporation and Securities Bureau, pursuant to its statutory authority, issued a Cease and Desist Order directed to Martin-Marietta and United Technologies regarding their tender offers for Bendix stock. The Cease and Desist Order required Martin-Marietta and United Technologies to cease and desist from making allegedly false statements, and committing other allegedly unlawful acts in connection with their tender offers for Bendix stock. The allegedly misleading statements were that Martin-Marietta and United Technologies failed to state that the Martin-Marietta and United Technologies' offers were so closely intertwined as to constitute one offer, that Martin-Marietta and United Technologies failed to state in an [intelligible] format the conditions to which the offers were subject, and that the United Technologies' offer failed to state that United Technologies may lack the power

---

1. With respect to Bendix, Martin-Marietta and United Technologies' tender offers, all other relevant jurisdictions have entered into agreements with the participants not to enforce their tender offer acts with the exception of Michigan.

under state law and fiduciary principles to sell Bendix assets to Martin-Marietta. The Cease and Desist Order cites as other unlawful acts Martin-Marietta's willingness to pay broker-dealers a $.60 per share fee for soliciting shares on Martin-Marietta's behalf and both Martin-Marietta and United Technologies' failure to file their tender offer solicitation documents with the Michigan Corporation and Securities Bureau as required by the Michigan Take-Over Offers Act *and* the Michigan Uniform Securities Act. The Cease and Desist Order stated that unless Martin-Marietta or United Technologies requested a hearing within fifteen days, the Order would stand as final. On September 10, counsel for Martin-Marietta, United Technologies and Bendix appeared before the District Court. Martin-Marietta and United Technologies renewed their motions for temporary restraining orders and further requested preliminary injunctive relief against any enforcement in state court of the Cease and Desist Order. The District Court denied these renewed motions, making the finding that it did not find that the *"MITE"* decision [*Edgar v. MITE Corp.,* —— U.S. ——, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982)] "declared as unconstitutional the public interest that the State of Michigan legislature has expressed concerning the anti-fraud provision of the Take-Over Act. That still stands."

On September 14, Martin-Marietta and United Technologies each filed amended complaints seeking declaratory and injunctive relief against enforcement of the Cease and Desist Order in state enforcement proceedings based on the unconstitutionality of *both* the Take-Over Offers Act and the anti-fraud provisions of both the Take-Over Offers Act and the Uniform Securities Act as applied to interstate tender offers.

Kelley and Mackey brought an action in the Michigan Circuit Court for the County of Oakland on September 15 against Martin-Marietta and United Technologies seeking an injunction prohibiting Martin-Marietta and United Technologies from violating the Cease and Desist Order, violating the anti-fraud provisions of the Take-Over Offers Act or the Uniform Securities Act or acquiring or attempting to acquire shares of Bendix from any Michigan resident. *Kelley v. Martin-Marietta Corp. & United Technologies Corp.,* No. 82–247335–AZ (Oakland County Circuit Court). Bendix simultaneously moved to intervene in that action. An Order to Show Cause issued by the Oakland County Circuit Court required Martin-Marietta and United Technologies to show cause why an order should not be entered granting the relief sought in the complaint, except that the Order to Show Cause differed from the complaint for the injunction in that it contained a proposed prohibition against Martin-Marietta or United Technologies from purchasing *any* shares of Bendix common stock pursuant to their tender offers.

The District Court heard Martin-Marietta and United Technologies' motions for preliminary injunction on September 17, after Bendix had purchased over 50% of Martin-Marietta's outstanding shares. The District Court denied injunctive relief on the ground that an injunction would be prohibited by the Anti-Injunction Act and the abstention doctrines. The Court also stated that Martin-Marietta and United Technologies had not met the requirements for a preliminary injunction. Specifically, Martin-Marietta and United Technologies did not show that there was a substantial likelihood that they would prevail on the merits of their claims that the anti-fraud provisions of the Take-Over Offers Act were unconstitutional on their face and under either the supremacy clause or the commerce clause or that the anti-fraud provisions of the Take-Over Offers Act or the Uniform Securities Act are or will be applied unconstitutionally by state officials or the state courts. The court found that Martin-Marietta and United Technologies did not show that they would suffer irreparable injury unless an injunction was obtained because they did not avail themselves of the opportunity to participate in available state hearings. Furthermore, Martin-Marietta and United Technologies did not show that Bendix, its stockholders and the State of Michigan would suffer no substantial harm by the issuance of the preliminary injunction, or

that the public interest would be served by its issuance. Martin-Marietta and United Technologies appeal from these determinations.

By stipulation of the parties and leave of this Court the record on appeal has been supplemented. Subsequent to this appeal, the Circuit Court for the County of Oakland issued an order limiting "offerees" as defined in the Take-Over Offers Act, Mich. Comp.Laws Ann. § 451.903(2), to only Michigan residents who are record or beneficial owners of an equity security. The state court then enjoined Martin-Marietta and United Technologies from soliciting Michigan residents in their tender offers until they made the disclosures required by the anti-fraud provisions of the two statutes, cured the allegedly false and misleading statements referred to in the Cease and Desist Order and incorporated other curative instructions in the Cease and Desist Order. Martin-Marietta and United Technologies were further restrained from engaging in any act or practice constituting a violation of either statute.

Martin-Marietta and United Technologies filed materials with the Michigan Corporation and Securities Bureau on September 21, and Mackey responded with an opinion letter "pursuant to" the state circuit court Order on that day. Reiterating that appellants were prohibited from purchasing Bendix shares from Michigan residents while proceedings continued, Mackey ordered appellants, among other things, either to combine their respective offers into one offer or to prepare a joint supplement stating their offers constitute a joint offer. The letter contemplated that the "shareholders would be afforded an opportunity to review the revised materials for some period of time prior to making a decision as to whether to tender their shares to Bendix."

### I. Anti-Injunction Act

As a threshold matter, we disagree with the District Court that the issuance of an injunction would be barred by the Anti-Injunction Act, 28 U.S.C. § 2283,

and *Roth v. Bank of the Commonwealth,* 583 F.2d 527 (6th Cir. 1978), *cert. denied,* 442 U.S. 925, 99 S.Ct. 2852, 61 L.Ed.2d 292 (1979). 42 U.S.C. § 1983, under which both Martin-Marietta Corporation and United Technologies Corporation have brought claims, is an "expressly authorized" exception to the Anti-Injunction Act. *Mitchum v. Foster,* 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972). Martin-Marietta and United Technologies both state claims under section 1983. Each alleges, in part, that the provisions of the Michigan Take-Over Offers Act and the Michigan Uniform Securities Act, including the anti-fraud provisions, are violative of the Supremacy Clause and the Commerce Clause of the United States Constitution and that their enforcement by the State of Michigan and/or Bendix would deprive them of rights secured under the Williams Act and these constitutional provisions. *Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980) (federal statute). It is academic that the State of Michigan, which instituted the state court enforcement proceedings pursuant to Mich.Comp.Laws Ann. § 451.914(1), (2), is acting under color of state law. Bendix elected to intervene in the state enforcement proceedings as a *party plaintiff.* Under Mich.Comp. Laws Ann. § 451.917(2), Bendix was authorized by statute to bring an action in state court to enjoin any violation of the Michigan Take-Over Offers Act or enforce compliance with it.[2] Private individual conduct may constitute action under color of state statute where the power possessed by an individual or entity is possessed only because the individual or entity is clothed with the authority of state law. *See Northrip v. Federal National Mortgage Ass'n,* 527 F.2d 23, 33 (6th Cir. 1975) (federal); *Barrera v. Security Building & Investment Corp.,* 519 F.2d 1166, 1170 (5th Cir. 1975) (federal). In addition, where a private individual or entity jointly engages with state officials in a challenged action, as Bendix is doing in fact, the private individual or entity is acting under the color of

---

2. Bendix was not a party to any state proceedings at the time the District Court refused the injunction. It has since been made a plaintiff in the Oakland County action.

a state statute for purposes of section 1983. *Dennis v. Sparks,* 449 U.S. 24, 27–28 (1980); *Lugar v. Edmondson Oil Co.,* —— U.S. ——, ——, 102 S.Ct. 2744, 2757, 73 L.Ed.2d 482 (1982).

## II. Abstention Doctrines

■ The District Court also considered itself constrained from exercising jurisdiction to enjoin the pending state court enforcement proceedings on abstention grounds citing *City Investing Co. v. Simcox,* 633 F.2d 56, 59–60 (7th Cir. 1980). We conclude that the District Court erred in its determination that the abstention doctrine articulated in *Railroad Comm'n of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), controlled. Neither the *Pullman* doctrine nor the *Younger* or *Burford* doctrines of abstention promulgated subsequent to *Pullman* preclude the exercise of jurisdiction to grant injunctive relief in this case. *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 639 (1971) (*Younger* doctrine), *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943) (*Burford* doctrine).

In *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976), the Supreme Court stated that abstention from the exercise of federal jurisdiction is the exception not the rule. Under the *Pullman* doctrine, where a state law is being challenged in federal court as contrary to the federal Constitution and there are questions of state law which may be dispositive of the case, a federal court should abstain from deciding the case and allow the state courts to decide the state issues. *Pullman* abstention is appropriate in a case where the challenged state statute is susceptible of a construction by the state judiciary that would avoid or modify the necessity of reaching the federal constitutional question. *Babbitt v. United Farm Workers,* 442 U.S. 289, 306, 99 S.Ct. 2301, 2312, 60 L.Ed.2d 895 (1979), citing *Kusper v. Pontikes,* 414 U.S. 51, 54, 94 S.Ct. 303, 306, 38 L.Ed.2d 260 (1973). *Pullman* abstention is not appropriate, however, where it is clear that the statute is unconstitutional no matter how it may be construed by the state courts. *See Kusper, supra; Wisconsin v. Constantineau,* 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971). In *Simcox,* cited by the District Court as controlling, the Seventh Circuit found the district court's decision to abstain appropriate. At issue in that case was whether the plaintiffs' acts constituted a tender offer within the meaning of the Indiana Takeovers Act. A ruling by a state court that plaintiffs' activities did not constitute a "take-over" would have mooted plaintiffs' constitutional claims, a situation which is squarely covered by the *Pullman* doctrine. In this case, in contrast, appellees have suggested no construction which could remedy the constitutional defects which we find exist in the Michigan Take-Over Offers Act and the Michigan Uniform Securities Act, and we can discern none. *See* discussion *infra.* There is no constitutionally acceptable interpretation of the Michigan statute which would permit the state defendants to interfere with the timetable established by Congress under the Williams Act, a timetable which both parties have sought to employ free of state interference in various proceedings.

Neither do we consider ourselves barred by the *Younger* doctrine.[3] In *Younger,* the Supreme Court held that, absent extraordinary circumstances, a federal court is precluded from enjoining a pending state proceeding. *Younger, supra,* (pending criminal proceeding). *Accord, Moore v. Sims,* 442 U.S. 415, 423, 99 S.Ct. 2371, 2377, 60 L.Ed.2d 994 (1979) (pending civil proceeding); *Huff-*

---

**3.** The case of *Kennecott Corp. v. Smith,* 637 F.2d 181 (3d Cir. 1980), cited by Martin-Marietta and United Technologies as controlling is inapplicable here. In *Kennecott,* the Third Circuit remanded a case to the district court for further proceedings after it had abstained on *Younger* grounds even though there was no state court proceeding pending at the time the district court issued its opinion denying a preliminary injunction. State proceedings were subsequently brought. In contrast, in this case state court enforcement proceedings were pending at the time the District Court was confronted with the need to make a decision on the preliminary injunction issue.

man v. Pursue, Ltd., 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975) (pending civil proceeding). The *Younger* court relied on the notion of federal/state comity, a respect for state functions and a belief that the federal system would benefit if states and their institutions were left to perform their separate functions in separate ways. *Id.,* 401 U.S. at 43–45, 91 S.Ct. at 750–751. They also relied upon traditional principles of equity jurisprudence, among them the principle that an injunction will not be granted where the plaintiff has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief. *Id.,* 401 U.S. at 43–44, 91 S.Ct. at 750. The doctrine of *Younger* non-interference "naturally presupposes the opportunity to raise and have timely decided by a competent state tribunal the federal issue involved." *Trainor v. Hernandez,* 431 U.S. 434, 441, 97 S.Ct. 1911, 1916, 52 L.Ed.2d 486 (1977); *Gibson v. Berryhill,* 411 U.S. 564, 577, 93 S.Ct. 1689, 1697, 36 L.Ed.2d 488 (1973). In *Younger,* however, the Court clearly left open the possibility of federal injunctive relief against a pending state court proceeding in certain exceptional circumstances, where irreparable injury is both "great and immediate," *Younger,* 401 U.S. at 46, 91 S.Ct. at 751, where the state law is "flagrantly and patently violative of express constitutional prohibitions," *id.,* 401 U.S. at 53, 91 S.Ct. at 754, and where there is a showing of "bad faith, harassment, or other unusual circumstances that would call for equitable relief," *id.,* 401 U.S. at 54, 91 S.Ct. at 755.

We conclude that the first *Younger* exception is available to permit injunctive relief in this case. Exceptional circumstances are presented by Bendix and Martin-Marietta and United Technologies' competing tender offers and Bendix and Martin-Marietta's race to control each other's board of directors. Even though Bendix is the first to obtain a controlling interest, Martin-Marietta may be the first to secure the removal of its adversary's board of directors. Given this time schedule, that time is of the essence, and that the only state court decision to date has found the anti-fraud provisions of both statutes to be constitutionally applied to interstate tender offers necessitating further appeals or pursuit of a writ of superintending control, we conclude that Martin-Marietta and United Technologies do not have an adequate opportunity to raise and have timely decided the federal issue involved. Since any further delay may effectively eliminate the possibility of Martin-Marietta and United Technologies' right to the procedures accorded them by the Williams' Act, we conclude that to not decide this issue at this time would cause a great and immediate irreparable injury.

The second *Younger* exception may also apply. In light of the commerce clause arguments of the Supreme Court in *MITE,* the provisions of the Michigan statutes permitting the state to interfere with the timetable of the nationwide tender offers may well be flagrantly and patently violative of express constitutional prohibitions. Furthermore, we believe the unusual facts of this case come within the catchall exception, "other unusual circumstances that would call for equitable relief." Here appellee Bendix has sought relief in other federal courts identical to that now pursued by appellants.

### III. Preliminary Injunction

It is well settled that the scope of review on appeal from the denial or granting of a preliminary injunction is limited to a determination of whether the District Court abused its discretion.

\* \* \* \* \* \*

In determining on appeal whether the District Court abused its discretion in granting or withholding preliminary injunctive relief, this Court has set forth four standards which must be considered:

1) Whether the plaintiffs have shown a strong or substantial likelihood or probability of success on the merits;

2) Whether the plaintiffs have shown irreparable injury;

3) Whether the issuance of a preliminary injunction would cause substantial harm to others;

4) Whether the public interest would be served by issuing a preliminary injunction. (citations omitted)

*Mason County Medical Ass'n v. Knebel,* 563 F.2d 256, 260–262 (6th Cir. 1977).

1. Likelihood of Prevailing on the Merits

■ To show a likelihood of prevailing on the merits, the appellant must show the likely existence of a constitutional violation causally related to the result sought to be enjoined. *Wilson v. Thompson,* 593 F.2d 1375, 1384–85 (5th Cir. 1979). Appellants contend that the anti-fraud and the respective enforcement provisions of the Michigan Take-Over Offers Act are unconstitutional on their face as applied to appellants' interstate tender offer. Accordingly, appellants seek to enjoin the state court proceedings threatened and later brought by appellees pursuant to those purportedly unconstitutional provisions. Mich.Comp.Laws Ann. § 451.914.[4]

■ The Michigan Take-Over Offers Act is essentially comprised of three types of provisions: (1) Procedural Provisions; (2) Anti-Fraud Provisions; and (3) Enforcement Provisions. The parties agree that various time requirements of the procedural provisions of the Act are constitutionally infirm. The District Court declined to rule on the constitutionality of the antifraud provisions of the Act and those provisions designed to enforce same, although implicit in its holding that appellants had failed to show a strong likelihood of succeeding on

the merits is a conclusion that the statute had not been shown to be unconstitutional. We find that to the extent that the state statutes confer power on state authorities to interfere with the timing of an interstate tender offer made under the Williams Act, or to compel the revision of the solicitation or tender offer as a condition of proceeding, they impose an unconstitutional burden on interstate commerce.

As appellants' claim can be satisfied by a holding which passes only upon the limited question of the constitutionality of the enforcement provisions of the Act, we find it unnecessary at this time to address the question of the viability of a provision assessing damages for non-compliance with the substantive anti-fraud provisions of the Act.

The injunctive proceedings set forth in Mich.Comp.Laws Ann. § 451.914 and utilized by state appellees are analogous to the delay provisions struck down by the Supreme Court in *Edgar v. MITE Corp., supra.* They interfere with the timing of an interstate tender offer made under the Williams Act.

Justice White, writing for a majority of the Supreme Court, *id.,* —— U.S. at ——, 102 S.Ct. at 2640, reasoned as follows:

> The Commerce Clause provides that "Congress shall have Power . . . [t]o regulate Commerce . . . among the several states." U.S.Const., Art. 1, § 8, cl. 3. "[A]t least since *Cooley v. Board of Wardens,* 12 How. 299 [13 L.Ed. 996]

4. **451.914 Violations; cease and desist orders, hearing; action to enjoin and enforce compliance**

Sec. 14. (1) When it appears to the administrator that a person is engaged or is about to engage in an act or practice constituting a violation of this act, the administrator may order the person to cease and desist from further violation unless and until the person is in compliance with this act. If, after making the order, a request for hearing is filed in writing by the person to whom the order was directed, a hearing shall be held as provided in this act.

(2) When it appears to the administrator that a person, including an affiliate of an offeror or target company, engaged, or is about to engage in, an act or practice consti-

tuting a violation of this act or a rule or order, the administrator may bring action in the name of the state in a circuit court to enjoin the acts or practices and to enforce compliance with this act or a rule or order promulgated or issued under this act, or may refer the matter to the attorney general or the prosecuting attorney of the appropriate county. Upon a proper showing, the court may grant a permanent or temporary injunction or restraining order or may order rescission of a sale or purchase of securities determined to be in violation of this act or a rule or order promulgated or issued under this act. The court may not require the administrator to post a bond.

P.A.1976, No. 179, § 14, Imd.Eff. July 1.

(1852), it has been clear that 'the Commerce Clause .... even without implementing legislation by Congress is a limitation upon the power of the States.' " *Great Atlantic & Pacific Tea Co. v. Cottrell*, 424 U.S. 366, 370–371 [96 S.Ct. 923, 927, 47 L.Ed.2d 55] (1976), quoting *Freeman v. Hewitt*, 329 U.S. 249, 252 [67 S.Ct. 274, 276, 91 L.Ed. 265] (1946). See also *Lewis v. BT Investment Managers, Inc.*, 447 U.S. 27, 35 [100 S.Ct. 2009, 2014, 64 L.Ed.2d 702] (1980). Not every exercise of state power with some impact on interstate commerce is invalid. A state statute must be upheld if it "regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental ... unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 [90 S.Ct. 844, 847, 25 L.Ed.2d 174] (1970), citing *Huron Cement Co. v. Detroit*, 362 U.S. 440, 443 [80 S.Ct. 813, 815, 4 L.Ed.2d 852] (1960). The Commerce Clause, however, permits only *incidental* regulation of interstate commerce by the states; direct regulation is prohibited. *Shafer v. Farmers Grain Co.*, 268 U.S. 189, 199 [45 S.Ct. 481, 485, 69 L.Ed. 909] (1925). See also *Pike v. Bruce Church, Inc., supra* [397 U.S.] at 142 [90 S.Ct. at 847].

The burden imposed by Michigan in (a) requiring a prospective nationwide tender offeror to file a registration statement with the State Department of Commerce and (b) in the cost and time involved in litigation brought under the Act to block or delay a tender offer, must be balanced against the putative local benefits advanced by such burden. The interest asserted by the State as justification for these requirements is the purported interest of the State of Michigan in protecting local shareholders by subjecting the materials disclosed to anti-fraud review by the Michigan Corporation and Securities Bureau. We must determine how much weight to assign this purported interest. As noted in *MITE:*

> While protecting local investors is plainly a legitimate state objective, the state has no legitimate interest in protecting non-resident shareholders. Insofar as Illinois law burdens out-state transactions, there is nothing to be weighed in the balance to sustain the law.

*Id.* —— U.S. at ——, 102 S.Ct. at 2642. Mich.Comp.Laws Ann. § 451.911 provides that:

> An offeror may not make a take-over offer which is not made to security holders in this state on substantially the same terms as the offer is made to security holders outside the state.

Thus, all of the provisions set forth in the balance of the Take-Over Act are expressly applicable to out-state transactions. As to this extraterritorial effect, the provisions constitute an unconstitutional burden on interstate commerce because there exists no legitimate state interest in the protection of non-resident shareholders. There is profound extraterritorial effect in the instant case because 95% of the target company's shareholders reside outside the State of Michigan. This burden is excessive in relation to the putative state interest advanced by the Take-Over Act and, therefore, unconstitutionally burdens interstate commerce.

It is arguable that section 451.911 could be severed from the Act. In so severing the provision, we are left with the protection of local investors as the putative local benefit advanced by the Act. The statute, however, is not drawn to protect this interest. Mich.Comp.Laws Ann. § 451.904(2)(f) provides:

> (2) A take-over offer does not include an offer to acquire or the acquisition of an equity security * * * (f) By the issuer of the security.

This distinction in the requirements imposed upon issuers and non-issuers of corporate securities who seek to extend take-over offers is at variance with Michigan's asserted legislative purpose for imposing burdens on interstate commerce. If the putative local benefit advanced by the Act is the protection of local investors, and if an exception exists within the Act which under-

mines this purported benefit, then the Act does not enhance the position of local shareholders and does not serve any local interest. The Supreme Court so reasoned in *MITE, supra,* —— U.S. at ——, 102 S.Ct. at 2642.

To the extent that the Michigan statutes interfere with a nationwide take-over offer which is already subject to the provisions of the Williams Act, they violate the commerce clause. A Michigan circuit judge has now construed the Michigan statute to limit to shareholders who are Michigan residents. However, the Michigan statute, as applied, still impermissibly burdens interstate commerce. It prevents Michigan shareholders from participating in the nationwide tender offer because of provisions of the Michigan statutes. This is an indirect burden on interstate commerce in that it has the effect of defeating the tender offers of residents from other states where the tendered shares owned by Michigan residents are needed to provide sufficient tendered shares to satisfy the tender offer.

In *MITE, supra,* —— U.S. at —— – ——, 102 S.Ct. at 2635–37, Justice White set forth an extensive survey of the legislative history behind adoption of the Williams Act.

> We note at the outset that in passing the Williams Act, which is an amendment to the Securities and Exchange Act of 1934, Congress did not also amend § 28(a) of the 1934 Act, 15 U.S.C. § 78bb(a). In pertinent part, § 28(a) provides as follows:
>
> > "Nothing in this chapter shall affect the jurisdiction of the securities commission (or any agency or officer performing like functions) of any state over any security or any person insofar as it does not conflict with the provisions of this chapter or the rules and regulations thereunder."
>
> Thus Congress did not explicitly prohibit states from regulating takeovers; it left the determination whether the Illinois statute conflicts with the Williams Act to the courts.

\*      \*      \*      \*      \*      \*

The Williams Act, passed in 1968, was the congressional response to the increased use of cash tender offers in corporate acquisitions, a device that had 'removed a substantial number of corporate control contests from the reach of exsiting [sic] disclosure requirements of the federal securities laws.' *Piper v. Chris-Craft Industries,* 430 U.S. 1, 22, 97 S.Ct. 926, 939, 51 L.Ed.2d 124 (1977). The Williams Act filled this regulatory gap.

It is clear that in filling the gap, Congress intended that the Williams Act protect investors. It is equally clear, however, that Congress adopted a 'Market Approach', as opposed to a 'Fiduciary Approach,' in its effort to protect the investor.

> The function of federal regulation is to get information to the investor by allowing both the offeror and the incumbent managers of a target company to present fully their arguments and then to let the investor decide for himself.

*Attorney General v. Beta-X Corp.,* 103 Mich.App. 51, 55, 302 N.W.2d 596 (1981), *leave to appeal granted,* 412 Mich. 853, 312 N.W.2d 152 (1981), quoting *Great Western United Corp. v. Kidwell,* 577 F.2d 1256, 1276 (5th Cir. 1978), *rev'd on other grounds sub nom. Leroy v. Great Western United Corp.,* 443 U.S. 173, 99 S.Ct. 2710, 61 L.Ed.2d 464 (1979).

> The reason for this approach was congressional recognition that tender offers often benefit an investor and that a statute preventing tender offers could harm, rather than protect, investors.

*Id.,* quoting S.Rep.No. 550, 90th Cong., 1st Sess. at 3 (1967) (Senate Report); H.R.Rep. No.1711, 90th Cong., 2d Sess. at 3 (1968) (House Report); U.S.Code Cong. & Admin. News 1968, p. 2811 (footnotes omitted). Neither favoring incumbent management nor the takeover bidder, Congress adopted a policy of "evenhandedness," thereby permitting the investor to make his own independent but informed decision whether to sell. *Piper v. Chris-Craft Industries,* 430 U.S. at 31, 97 S.Ct. at 944. As set forth in H.R.Rep.No.94–1373, 94th Cong., 2d Sess. 12 (1976), the basic purpose of the Williams

Act is "to maintain a neutral policy towards cash tender offers, by avoiding lengthy delays that might discourage their chances for success." "According to the Securities and Exchange Commission, delay enables a target company to: (1) repurchase its own securities; (2) announce dividend increases or stock splits; (3) issue additional shares of stock; (4) acquire other companies to produce an anti-trust violation should the tender offer succeed; (5) arrange a defensive merger; (6) enter into restrictive loan agreements; (7) institute litigation challenging the tender offer." *MITE, supra,* —— U.S. at —— n.13, 102 S.Ct. at 2639 n.13.

Accordingly, appellants have shown a likelihood of success on the merits in arguing that application of the Michigan Take-Over Offers Act to interstate tender offers imposes an impermissible burden on interstate commerce.

The Michigan Securities Act, Mich.Comp. Laws Ann. §§ 451.501–451.818, likewise speaks in nationwide terms. Because its burden as well is excessive if it interferes with the timing of the national takeover, its use for that purpose is unconstitutional.

### 2. Irreparable Injury

In the context of a tender offer, time is of the essence. "[T]he cumulative impact of the effects flowing from delaying commencement of the offer is to 'disrupt the neutrality essential to the execution and proper operation of the market approach for protecting investors embraced by the Williams Act.'" *Kennecott Corp. v. Smith,* 637 F.2d 181, 190 (3d Cir. 1980). Thus, subjecting appellants to an unconstitutional application of the Michigan Take-Over Offers Acts amounts to irreparable injury. The irreparable injury to Martin-Marietta and United Technologies flows from the denial of their rights under federal securities law. Appellants are in danger of losing the opportunity, which the evenhanded operation of the Williams Act guarantees them, to attempt to acquire Bendix stock. Such loss could not be compensated by money damages.

### 3. Substantial Harm to Others—Balance of Harms

The irreparable injury appellants will suffer if their motion for injunctive relief is denied must be balanced against any harm which will be suffered by appellees as a result of the granting of injunctive relief.

The purported interest of the State of Michigan in protecting its local investors or local businesses cannot be elevated above the policy embraced by the Williams Act. Bendix has no right to the unconstitutional application of state law. The anti-fraud provisions of the Williams Act are open to Bendix and claims under that act may be pursued in the federal litigation pending in Baltimore, Maryland. Bendix is not entitled to anything more; it has no right to have state securities or take-over law applied here in order to block appellants' tender offers.

The balance tips in favor of the appellants.

### 4. Public Interest

The public interest would best be served by granting the injunction. It is in the public interest not to perpetuate the unconstitutional application of a statute. The public interest is most immediately embodied in the shareholders, persons whose interests are protected by the policies underlying the Williams Act. A market approach in the area of tender offers was adopted by Congress due to its recognition that tender offers often benefit an investor and that a statute preventing tender offers could harm, rather than protect, investors. Nationwide tender offers cannot be interfered with by the application of the fifty states' different securities laws. Moreover, the public has no interest in the enforcement of laws in an unconstitutional manner. On the other hand it is distinctly in the public interest to maintain that neutrality which Congress has found essential to the proper operation of the market approach for protecting investors embraced by the Williams Act.

It was represented in oral argument that the premium offered over the market price for Bendix stock when the tender offer was

made by appellants would amount to approximately $25,000,000 with respect to Michigan shareholders. If this Court were to permit the Cease and Desist Order to remain in effect, Michigan residents might well be denied the opportunity to tender their shares and receive cash and thus might well be placed at a disadvantage as compared to shareholders in other states.

The judgment of the District Court is reversed and the action is remanded to the District Court for entry of a preliminary injunction in the form of the preliminary injunction entered concurrent herewith, and for further proceedings consistent with this opinion.