TYSON FOODS, INC. and Holly Acquisition Corp., Plaintiffs,

v.

Elaine A. McREYNOLDS, Commissioner of the Tennessee Department of Commerce and Insurance; Charles W. Burson, Attorney General of the State of Tennessee; and Holly Farms Corporation, Defendants.

Civ. A. No. 3–88–0881.

United States District Court,
M.D. Tennessee,
Nashville Division.

Nov. 23, 1988.

Ames Davis, Waller, Lansden, Dortch & Davis, Corabell Alexander, Nashville, Tenn., for plaintiffs.

Charles N. Jolly, Chattanooga, Tenn., William O. Collins, Jr., Cornelius & Collins, Nashville, Tenn., for Tennessee Assoc. of Business.

Charles W. Burson, John Knox Walkup, Albert L. Partee, III, Kathleen A. Eyler, Atty. General's Office, Nashville, Tenn., for defendants.

John K. Maddin, Jr., Malcolm L. McCune, Gracey, Maddin, Miller & McCune, James A. Vick, Nashville, Tenn., Ben Rosenberg, Paul Vizcarrondo, Jr., Wachtell, Lipton, Rosen & Katz, New York City, pro hac vice, for defendant Holly Farms Corp.

## MEMORANDUM

WISEMAN, Chief Judge.

Plaintiffs move for a preliminary injunction enjoining defendants from enforcing or attempting to enforce in connection with plaintiffs' tender offer for shares of Holly Farms Corporation Tennessee's Investor Protection Act, Tenn.Code Ann. 48–35–101 to –113 (1988), Business Combination Act, Tenn.Code Ann. 48–35–201 to –209 (1988), Control Share Acquisition Act, Tenn.Code Ann. 48–35–301 to –312 (1988), and Authorized Corporation Protection Act, Tenn. Code Ann. 48–35–401 to –406 (1988). Plaintiffs' motion is granted. This Court finds that these Acts violate the Commerce Clause of the United States Constitution to the extent they apply to target corporations organized under the laws of states other than Tennessee. This Court does not reach plaintiffs' claim that the legislation at issue also violates the Supremacy Clause.

## I. The Tennessee Acts

The challenged statutes became law on March 11, 1988. Their length dictates that this Court summarize the relevant provisions.

The Investor Protection Act ("IPA") applies to tender offers directed at corporations (called "offeree companies") that have "substantial assets" in Tennessee and that are either incorporated in or have their principal offices in Tennessee. The IPA requires an offeror making a tender offer for an offeree company to file with the Commissioner of Commerce and Insurance ("the Commissioner") a registration statement. This registration statement contains information similar to that which federal law requires to be disclosed. When the offeror intends to gain control of the offeree company, the registration statement

must indicate any plans the offeror has for the offeree. The Commissioner may request additional information material to the takeover offer and may call for hearings. The IPA does not apply to an offer that the offeree company's board of directors recommends to shareholders.

The IPA requires the offeror and the offeree company to deliver to the Commissioner all solicitation materials used in connection with the tender offer. The Act prohibits "fraudulent, deceptive, or manipulative acts or practices" by either side. The IPA gives the Commissioner standing to apply for equitable relief to the Chancery Court of Davidson County whenever it appears to her that the offeror, the offeree company, or any of their affiliates has engaged in or is about to engage in a violation of the IPA. The IPA provides that "[u]pon a proper showing," the Chancery Court may grant injunctive relief. The IPA provides civil and criminal penalties for violations.

The Business Combination Act ("BCA") provides that a party owning ten percent or more of stock in a "resident domestic corporation" (such party is called an "interested shareholder") cannot engage in a business combination with the resident domestic corporation unless the combination (1) takes place at least five years after the interested shareholder first acquired ten percent or more of the resident domestic corporation, and (2) either (a) is approved by at least two-thirds of the noninterested voting shares of the resident domestic corporation or (b) satisfies certain fairness conditions specified in the BCA.

These provisions apply unless one of two events occurs. A business combination with an entity can proceed without delay when approved by the target corporation's board of directors before that entity becomes an interested shareholder. Or the resident domestic corporation may enact a charter amendment or bylaw to remove itself entirely from the BCA. This charter amendment or bylaw must be approved by a majority of those shareholders who have held shares for more than one year prior to the vote. It may not take effect for at least two years after the vote.

The BCA exempts from liability officers and directors of resident domestic corporations who do not approve proposed business combinations or charter amendments and bylaws removing their corporations from BCA coverage. The officers and directors must act in "good faith belief" that the proposed business combination would adversely affect their corporation's employees, customers, suppliers, or the communities in which their corporation operates.

The Control Share Acquisition Act ("CSAA") strips a purchaser's shares of voting rights anytime an acquisition of shares in a covered Tennessee corporation brings the purchaser's voting power to one-fifth, one-third, or a majority of all voting power. The purchaser's voting rights can be established only by a majority vote of the other shareholders. The purchaser may demand a special meeting of shareholders to conduct such a vote. The purchaser can demand such a meeting before acquiring a control share only if it holds at least ten percent of outstanding shares and announces a good faith intention to make the control share acquisition. A target corporation may or may not redeem the purchaser's shares if the shares are not granted voting rights.

The Authorized Corporation Protection Act ("ACPA") is the gateway through which the BCA and CSAA can govern foreign corporations. The ACPA provides that an authorized corporation can adopt a bylaw or charter provision electing to be subject to the operative provisions of the BCA and CSAA, which then become applicable "to the same extent as such provisions apply to a resident domestic corporation." Authorized corporations are those that are required to obtain a certificate of authority from the Tennessee Secretary of State and that satisfy two or more of these tests:

(1) The corporation has its principal place of business located in Tennessee;

(2) The corporation has the principal office(s) or place(s) of business of significant subsidiaries, representing in the

aggregate not less than twenty percent of such corporation's consolidated net sales, located in Tennessee;

(3) A majority of such corporations's fixed assets, including those of any subsidiary, located in the United States, as valued by reference to the balance sheet at the end of its most recent fiscal year, are located in Tennessee;

(4) More than ten percent of the beneficial owners of the voting stock or more than ten percent of such corporation's share of voting stock are beneficially owned by residents of Tennessee;

(5) The corporation, including any significant subsidiary, employs more than two hundred fifty individuals in Tennessee or has a combined annual payroll paid to residents of Tennessee that is in excess of five million dollars;

(6) The corporation, including any significant subsidiary, produces goods and/or services in Tennessee that result in annual gross receipts in excess of ten million dollars;

(7) The corporation, including any significant subsidiary, has physical assets and/or deposits, including those of any subsidiary, located within Tennessee that exceed ten million dollars in value.

The ACPA seeks to protect the target's "shareholders, employees, customers, suppliers and local communities," and to prevent local "unemployment, plant closings, reduced charitable donations, declining population base, reduced income to fee-supported local government services, reduced tax base and reduced income to other businesses."

The ACPA contains a conflicts provision. Section 48–35–405 provides:

If any jurisdiction under the laws of which an authorized corporation is organized adopts any laws containing provisions that are expressly inconsistent with the provisions of this part as applicable to such authorized corporation, the provisions of this part shall be inapplicable to such authorized corporation to the extent necessary to resolve such inconsistency.

## II. Findings of Fact

Tyson Foods, Incorporated, through its wholly-owned subsidiary, Holly Acquisition Corporation, commenced a nationwide tender offer for common shares of Holly Farms Corporation on October 21, 1988. The tender offer and the loan commitment pursuant to which the acquisition will be financed state as a condition that Tyson not be threatened with the business combination or control share effects allegedly produced by the Tennessee statutes. Tyson intends to propose a merger with Holly Farms if its offer is successful.

Tyson Foods and Holly Acquisition are Delaware corporations. Holly Farms is also a Delaware corporation. Holly Farms' principal executive offices are in Tennessee. Holly Farms conducts operations through subsidiaries incorporated in ten states and has facilities in twenty-two states. Holly Farms' contacts with Tennessee suggest that it is an "authorized corporation" under the ACPA. Holly Farms opted into the ACPA on November 2, 1988. Holly Farms thus acquired the protection of Tennessee's BCA and CSAA. Holly Farms qualifies as an "offeree company" under the IPA.

Elaine A. McReynolds is the Commissioner of the Tennessee Department of Commerce and Insurance. Charles W. Burson is the Attorney General of the State of Tennessee.

## III. Plaintiffs' Challenge is Ripe

██ Holly Farms asserts that this action is not ripe for decision. Tyson's offer contains several conditions. Holly Farms argues that this Court will have issued an advisory opinion should any one of these conditions ultimately not be met.

Precedent precludes this argument. Courts routinely reach the merits of actions challenging less than all the impediments to the success of a tender offer. *See, e.g.,* *Gelco Corp. v. Coniston Partners,* 652 F.Supp. 829, 837 (D.Minn.1986), *aff'd in part and vacated in part on other grounds,* 811 F.2d 414 (8th Cir.1987) (adjudicating poison pill and Minnesota takeover

statute where offer subject to six conditions). Most of the precedent that guides this Court's analysis below would not exist if Holly Farms correctly states the law. Holly Farms is covered by the IPA and has opted into the ACPA. Tyson's challenge to the Tennessee Acts is ripe.

## IV. Commerce Clause Analysis of the Tennessee Acts

This action involves a tender offer for a corporation organized under the laws of a state other than Tennessee. This Court limits its analysis and holding to the Tennessee statutes as they apply in this case. This Court therefore takes no position on the constitutionality of the IPA, BCA, or CSAA as they apply to Tennessee corporations.

Tennessee recently joined a growing number of states seeking to protect their local economies and shareholders through corporate takeover legislation. The Commerce Clause limits the power of states to regulate or interfere with the free flow of interstate commerce. The Commerce Clause prohibits Tennessee's attempt to regulate tender offers for non-Tennessee corporations.

### A. The ACPA

■ Tennessee's ACPA violates the Commerce Clause for three reasons: it directly regulates interstate commerce; it creates a risk of inconsistent regulation; and its burden on interstate commerce is excessive in relation to its local benefits.

### 1. Direct Regulation of Interstate Commerce

"The Commerce Clause permits ... only *incidental* regulation of interstate commerce by the States; direct regulation is prohibited." *Edgar v. MITE Corp.*, 457 U.S. 624, 640, 102 S.Ct. 2629, 2639, 73 L.Ed.2d 269 (1982) (plurality opinion) (citing *Shafer v. Farmers Grain Co.*, 268 U.S. 189, 199, 45 S.Ct. 481, 485, 69 L.Ed. 909 (1925)). *See also Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). The ACPA is an undisguised attempt to insulate from competi-

tion management of foreign corporations doing business in Tennessee by directly regulating nationwide tender offers.

The Supreme Court recently upheld an Indiana statute similar in certain respects to Tennessee's CSAA but applying to Indiana corporations only. *See CTS Corp. v. Dyanamics Corp. of Am.*, 481 U.S. 69, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987). The *CTS* Court found that the burdens on interstate commerce created by the statute were merely incidental to Indiana's interest in regulating Indiana corporations. *See id.* 107 S.Ct. at 1649–52. But *CTS* makes clear that states do not have a similar interest in regulating foreign corporations. The Court in fact specifically distinguished *MITE*, which involved an Illinois statute similar to Tennessee's IPA, because the statute in that case "applied as well to out-of-state corporations as to in-state corporations." *Id.* at 1651.

Tennessee's ACPA therefore does not create burdens on interstate commerce incidental to the exercise of a legitimate state interest. Rather it directly regulates offers for non-Tennessee corporations to insulate these corporations from the market for corporate control. Such direct regulation is prohibited. *See MITE*, 457 U.S. at 641–43, 102 S.Ct. at 2640–41. (Illinois statute regulating offers for domestic and foreign corporations an impermissible direct restraint on interstate commerce) (plurality opinion). As the Supreme Court noted in *Lewis v. BT Investment Managers, Inc.*, 447 U.S. 27, 100 S.Ct. 2009, 64 L.Ed.2d 702 (1980):

> In almost any Commerce Clause case it would be possible for a State to argue that it has an interest in bolstering local ownership, or wealth, or control of business enterprise. Yet these arguments are at odds with the general principle that the Commerce Clause prohibits a State from using its regulatory power to protect its own citizens from outside competition. *Id.* at 43–44, 100 S.Ct. at 2019.

### 2. Risk of Inconsistent Regulation

State statutes that "adversely may affect interstate commerce by subjecting ac-

tivities to inconsistent regulations" also violate the Commerce Clause. *CTS*, 107 S.Ct. at 1649. The Tennessee Legislature sought to avoid this problem by providing that the ACPA is inapplicable to the extent the jurisdiction under which a foreign corporation is organized adopts any law containing provisions "expressly inconsistent" with the Tennessee statutes. *See* Tenn. Code Ann. S 48–35–405 (1988). Defendants assert that the ACPA thus avoids subjecting to inconsistent regulation tender offers for non-Tennessee corporations.

Defendants' argument assumes that no conflict exists between Tennessee's laws and the laws of the state of incorporation when the latter decides not to regulate takeovers of its corporations. This assumption is understandable. The ACPA applies only if a decision not to regulate does not conflict with Tennessee's provisions. But defendant's argument also assumes that the Tennessee Legislature has default authority to regulate nationwide tender offers for non-Tennessee corporations. *CTS* prohibits this assumption.

■ We live in a highly integrated national economy. Yet Congress has decided to regulate tender offers only to a limited extent. The Williams Act, codified at 15 U.S.C. SS 78m(d)–(e) and 78n(d)–(f) (1982), establishes certain procedural rules governing tender offers and requires certain disclosures of information by offerors. *See CTS*, 107 S.Ct. at 1644. The Williams Act clearly does not pre-empt all state regulation of tender offers. *Id.* at 1648 ("The longstanding prevalence of state regulation in this area suggests that, if Congress had intended to pre-empt all state laws that delay the acquisition of voting control following a tender offer, it would have said so explicitly.") The question remains, however, *which* state's law applies to a takeover attempt. *CTS* indicates that the jurisdiction with authority to regulate a given tender offer is the jurisdiction of the offeree's incorporation.

*CTS* held that the Indiana statute at issue did not create a risk of inconsistent regulation because it applied only to Indiana corporations. The Court explains:

So long as each State regulates voting rights only in the corporations it has created, such corporations will be subject to the law of only one State. No principle of corporate law and practice is more firmly established than a State's authority to regulate domestic corporations, including the authority to define voting rights of shareholders.... The markets that facilitate ... national and international participation in ownership of corporations are essential for providing capital not only for new enterprises but also for established companies that need to expand their businesses. This beneficial free market system depends at its core upon the fact that a corporation—except in the rarest situations—is organized under, and governed by, the law of a single jurisdiction, traditionally the corporate law of the State of its incorporation.... It is thus an accepted part of the business landscape in this country for States to create corporations, to prescribe their powers, and to define the rights that are acquired by purchasing their shares. A State has an interest in promoting stable relationships among parties involved in the corporations it charters, as well as ensuring that investors in such corporations have an effective voice in corporate affairs. *Id.* at 1649–51.

"Nationwide tender offers cannot be interfered with by the application of the fifty states' different securities laws." *Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 568 (6th Cir.1982). *CTS* resolves this problem by identifying the state of incorporation as the jurisdiction with regulatory authority over tender offers for the corporations it creates. This rule enhances predictability to the extent shareholders expect their rights to be governed by the laws of the state of incorporation. But more importantly it is the only rule compatible with the constitutional prohibition against inconsistent regulation.

Tennessee is one of at least twenty states with which Holly Farms has significant contacts. To allow Tennessee to regulate Tyson's tender offer for Holly Farms' stock is to guarantee inconsistent regula-

tion. *See Campeau Corp. v. Federated Dept. Stores,* 679 F.Supp. 735, 739 (S.D. Ohio 1988) (Application of Ohio takeover statute to foreign corporations "gives rise to an impermissible risk that many states could seek to regulate the acquisition of control of a national company ... which has substantial assets and principle places of business in states other than Ohio."); *TLX Acquisition Corp. v. Telex Corp.,* 679 F.Supp. 1022, 1030 (W.D.Okla.1987) ("It follows [from CTS] that when a state attempts to regulate voting rights in corporations other than those it has created, such corporations will be subject to the law of more than one state, which imposes an impermissible risk of inconsistent regulations by different states that may adversely affect interstate commerce.").

### 3. Excessive Burden on Interstate Commerce

■ A state statute violates the Commerce Clause when it imposes a burden on interstate commerce excessive in relation to local interests served by the statute. *MITE,* 457 U.S. at 644–46, 102 S.Ct. at 2641–43; *Pike v. Bruce Church, Inc.,* 397 U.S. at 142, 90 S.Ct. at 847. The ACPA is such a statute.

■ Protecting shareholders of resident corporations is a legitimate state interest. *See CTS,* 107 S.Ct. at 1651 (also finding that a state has no interest in protecting nonresident shareholders of nonresident corporations). But the BCA, CSAA, and ACPA seek to protect incumbent management, not shareholders. This is apparent, for example, in the BCA's provision that a charter amendment or bylaw exempting a corporation from the BCA and approved by a majority of shareholders who have held shares for more than one year prior to the vote may not take effect for two years after the vote. *See* Tenn.Code Ann. § 48–35–207(5) (1988). This provision indicates that the BCA's purpose is not to give shareholders "an effective voice in corporate affairs," *CTS,* 107 S.Ct. at 1651, but to deter hostile tender offers. Only management's advance approval allows a business combination to proceed without delay. *See* Tenn.Code Ann. § 48–35–205 (1988). Insu-

lating local operations of a nonresident corporation from interstate competition is not a legitimate state interest. *See supra,* III(A)(1).

The ACPA places an enormous burden on interstate commerce in relation to its suspect local benefits. An offeror has no hope of consummating a merger or other combination with the offeree for at least two years and possibly five absent approval of incumbent management. *See* Tenn. Code Ann. §§ 48–35–205, –207(5) (1988). An entity that wishes to purchase a control share in a covered corporation must acquire ten percent of outstanding shares before it even can determine whether it will be able to vote the control share. *See* Tenn.Code Ann. §§ 48–35–304 to –307 (1988).

These provisions significantly deter nationwide tender offers for non-Tennessee corporations. They impede the market for corporate control. "The Constitution does not require the states to subscribe to any particular economic theory." *CTS,* 107 S.Ct. at 1651. But the Constitution does limit one state's ability to impose its chosen theory on other states and their citizens and corporations. *See, e.g., TLX Acquisition Corp. v. Telex Corp.,* 679 F.Supp. at 1031 ("Oklahoma has no legitimate interest in the purely out-of-state sales of stock in a Delaware corporation acquired or to be acquired pursuant to a tender offer for a control share or in the voting rights attendant to the shares so transferred to weigh in its balance against the substantial burden that Oklahoma's [control share statute] places on interstate commerce.")

### B. The IPA

The IPA applies to offers for corporations having "substantial assets" in Tennessee and that are either incorporated in or have their principle offices in Tennessee. Tenn.Code Ann. § 48–35–102(7) (1988). This Court finds that the IPA violates the Commerce Clause to the extent it regulates offers for foreign corporations. The burden the statute imposes on interstate commerce is excessive compared to the local benefits the IPA produces.

The IPA minimally advances local interests. The IPA makes no distinction between resident and nonresident shareholders of foreign corporations. *Cf. Cardiff Acquisitions, Inc. v. Hatch*, 751 F.2d 906, 911 (8th Cir.1985) (distinguishing *MITE* because Minnesota Act at issue applied only when 20% of target's shareholders were Minnesota residents). Yet Tennessee has an interest in protecting Tennessee shareholders only. *See CTS*, 107 S.Ct. at 1651 (a state "has no interest in protecting nonresident shareholders of *nonresident corporations.*")

The IPA provides little help to shareholders to the extent it duplicates the disclosure requirements of the Williams Act. But to the extent the IPA diverges from federal law its protections are speculative. *MITE* found unconstitutional an Illinois statute similar to the IPA. The *MITE* Court agreed with the court below that "the disclosures required by the Illinois Act which go beyond those mandated by the Williams Act and the regulations pursuant to it may not substantially enhance the shareholders' ability to make informed decisions." *Id.* 457 U.S. at 645, 102 S.Ct. at 2642. *See also Mesa Petroleum Co. v. Cities Service Co.*, 715 F.2d 1425, 1430 (10th Cir.1983) (citing *MITE* in finding Oklahoma takeover statute's protections of "dubious value"). *Cf. L.P. Acquisition Co. v. Tyson*, 772 F.2d 201, 207 (6th Cir.1985) (distinguishing *MITE* and *Martin–Marietta Corp. v. Bendix Corp.* in partially upholding Michigan takeover statute because § 14(d) of the Williams Act did not apply to tender offer at issue and "in the absence of the federal disclosure requirements, the state's interest in protecting resident shareholders is enhanced.") This Court, like the *MITE* majority, is unconvinced that the statute at issue "substantially enhances the shareholders' position." *MITE*, 457 U.S. at 644, 102 S.Ct. at 2642.

This Court in fact suspects that shareholder protection may not be the primary purpose of the IPA. The IPA, like the other Tennessee Acts at issue, contains clues that its true object is protecting incumbent management. An offer approved by an offeree's board of directors, for example, is not a "takeover offer" subject to IPA provisions. Tenn.Code Ann. § 48–35–102(10)(B)(v) (1988). The IPA thus regulates only those offers distasteful to management.

The IPA meanwhile imposes a significant burden on interstate commerce. The IPA gives the Commissioner of Commerce and Insurance authority to require any information she deems material to an offer for a covered corporation. *See* Tenn.Code Ann. § 48–35–104(c) (1988). The Act also allows the Commissioner to prohibit use of any solicitation material deemed by her false or misleading. *See* Tenn.Code Ann. § 48–35–105(b) (1988). The Commissioner may promulgate rules and regulations necessary to administer the Act. Tenn.Code Ann. § 48–35–108 (1988). The Commissioner also may apply for equitable relief to the Chancery Court of Davidson County whenever she believes the offeror, the offeree company, or any of their affiliates is violating the IPA. Tenn.Code Ann. § 48–35–110 (1988). The Chancery Court may grant injunctive relief "[u]pon a proper showing." *Id.*

Defendants attempt to distinguish the IPA from the Illinois statute in *MITE*. The *MITE* majority found that the Illinois Business Take–Over Act, which applied to foreign as well as Illinois corporations, imposed burdens excessive in relation to the local interests it served. *MITE*, 457 U.S. at 643–45, 102 S.Ct. at 2641–42. Defendants argue that the statute in *MITE* created a greater burden on interstate commerce than the IPA because it gave Illinois's Secretary of State unilateral authority to block tender offers. *See id.* at 627, 102 S.Ct. at 2632. The Tennessee Commissioner has no such power under the IPA. She can enjoin a tender offer only by making a proper showing before the Chancery Court.

Defendants misconstrue *MITE*. *MITE* found that the effects of allowing an Illinois official to block a nationwide tender offer were "substantial". *Id.* at 643, 102 S.Ct. at 2641. The Court described these effects:

Shareholders are deprived of the opportunity to sell their shares at a premium. The reallocation of economic resources to their highest valued use, a process which can improve efficiency and competition, is hindered. The incentive the tender offer mechanism provides incumbent management to perform well so that stock prices remain high is reduced. *Id.*

These "substantial" effects are not diminished because a state official must go to state court to enjoin a nationwide tender offer. The Sixth Circuit thus held that the Michigan statute challenged in *Martin–Marietta Corp. v. Bendix Corp.* imposed an unconstitutional burden on interstate commerce. *Martin–Marietta Corp. v. Bendix Corp.*, 690 F.2d at 565–66. The Michigan statute allowed the Michigan Corporation and Securities Bureau to issue cease and desist orders regarding tender offers. But the Bureau also had to go to court to enjoin an offer. *See id.* at 565 n. 4 (quoting the Michigan statute). The court analogized the injunction provisions of the Michigan Act to the provisions in the *MITE* statute allowing the Illinois Secretary of State to block tender offers. *Id.* at 565. The court found excessive "[t]he burden imposed by Michigan in (a) requiring a prospective nationwide tender offeror to file a registration statement with the State Department of Commerce and (b) in the cost and time involved in litigation brought under the Act to block or delay a tender offer...." *Id.* at 566.

The IPA imposes the same burdens as the statute struck down in *Martin–Marietta.* The IPA significantly impedes nationwide tender offers for non-Tennessee corporations and produces little if any benefit for Tennessee shareholders. This Court acknowledges that *CTS* upheld a statute that might delay or deter tender offers. *See CTS*, 107 S.Ct. at 1646–47, 1652. But the statute in *CTS* regulated offers for domestic corporations only while substantially benefiting resident shareholders. The IPA is not such a statute.

## V.  Standards for a Preliminary Injunction

■ This Court must consider four standards in ruling on plaintiffs' motion for a preliminary injunction: (1) whether plaintiffs have shown a strong or substantial likelihood or probability of success on the merits; (2) whether plaintiffs have shown irreparable injury; (3) whether the preliminary injunction could harm other parties; and (4) whether the public interest will be served by issuing the injunction. *Frisch's Restaurant, Inc. v. Shoney's, Inc.*, 759 F.2d 1261, 1263 (6th Cir.1985); *Martin–Marietta Corp. v. Bendix Corp.*, 690 F.2d at 568–69.

Plaintiffs have demonstrated that the Tennessee legislation at issue is unconstitutional to the extent it regulates tender offers for non-Tennessee corporations. Plaintiffs also demonstrate irreparable harm. Tyson stands to lose at least three million dollars that it has already paid to obtain financing commitments for its offer. Aff. James D. Simpson, para. 4. Tyson may also lose the unique opportunity to acquire Holly Farms if application of the Tennessee statutes is not enjoined. *See generally TLX Acquisition Corp. v. Telex Corp.*, 679 F.Supp. at 1032 (holding that losing funds expended to obtain financing and losing the opportunity to control target corporation constitute irreparable harm). *See also Martin–Marietta Corp. v. Bendix Corp.*, 690 F.2d at 568 ("subjecting [tender offerors] to an unconstitutional application of [state laws regulating tender offers] amounts to irreparable injury.")

Holly Farms will not be injured by the preliminary injunction. Holly Farms has no right to the unconstitutional application of state law. *See id.* Nor will this Court serve the public interest by denying the injunction. "It is in the public interest not to perpetuate the unconstitutional application of a statute." *Id. Accord TLX Acquisition Corp. v. Telex Corp.*, 679 F.Supp. at 1033.

This Court grants plaintiff's motion for a preliminary injunction. Defendants are enjoined from enforcing or attempting to enforce any provision of the Tennessee IPA, BCA, CSAA, or ACPA in connection with

plaintiffs' tender offer for shares of Holly Farms Corporation.

## ORDER

For the reasons stated in the Memorandum opinion filed contemporaneously with this Order, plaintiffs' motion for a preliminary injunction is granted. Defendants are hereby enjoined from enforcing or attempting to enforce the Tennessee Investor Protection Act, the Tennessee Business Combination Act, the Tennessee Control Share Acquisition Act, or the Tennessee Authorized Corporation Protection Act in connection with plaintiffs' tender offer for shares of Holly Farms Corporation. This is an appealable order under 28 U.S.C. § 1292(a)(1).