**L.P. ACQUISITION COMPANY and L.P. Media, Inc., Plaintiffs,**

**v.**

**Carl L. TYSON, Acting Director of the Corporation and Securities Bureau of the Department of Commerce of the State of Michigan, et al., Defendants.**

**No. 85CV73341DT.**

United States District Court,
E.D. Michigan, S.D.

Aug. 7, 1985.

Theodore Souris, Detroit, Mich., for plaintiffs.

William M. Saxton, Detroit, Mich., Joe D. Sutton, Office of Mich. Atty. Gen., Lansing, Mich., for defendants.

## MEMORANDUM OPINION

### (FINDINGS OF FACT—CONCLUSIONS OF LAW)

DeMASCIO, District Judge.

Plaintiffs, L.P. Acquisition Company and L.P. Media, Inc. (LP or plaintiffs) filed a three-count complaint against Carl Tyson, Acting Director of the Securities & Exchange Bureau; Doug Ross, Director of the Michigan Department of Commerce; Frank Kelley, Michigan Attorney General; and The Evening News Association (ENA), seeking declaratory relief pursuant to 28 U.S.C. § 2201. Jurisdiction is based primarily upon 28 U.S.C. § 1331(a).

L.P. Acquisition is a wholly-owned subsidiary of L.P. Media. Both corporations were formed on July 26, 1985 for the purpose of acquiring ENA. The principals behind LP are A. Jerrold Perenchio and Norman Lear, self-described "entertainment industry executives." The ENA is a closely held corporation; i.e., its shares are not registered with the Securities and Exchange Commission (SEC) nor listed on any other exchange, a critical fact made clear to the court after study of briefs submitted by the parties. The ENA has approximately 333 shareholders and 45,000 shares outstanding. One-half of the shares and shareholders are located in Michigan; the remainder is found in 24 other states.

On July 28, 1985, LP commenced a cash tender offer of $1,000 per share directed to all shareholders of ENA wherever located. The offer is due to expire on August 23, 1985 and LP anticipates that it will begin to purchase shares on August 17, 1985. LP alleges voluntary compliance with § 14(d) of the Williams Act, 15 U.S.C. § 78n(d) and § 12(g) of the 1934 Securities Exchange Act (1934 Act), 15 U.S.C. § 78l(g). LP also alleges compliance with § 14(e) of the Williams Act, 15 U.S.C. § 78n(e), which plain-

tiffs contend applies to this (and every other) tender offer.

When making this tender offer, LP deliberately failed to comply with the requirements of the Michigan Take Over Offers Act (Take Over Act), Mich.Comp.Laws Ann. § 451.901 *et seq.*, which LP contends is unconstitutional as applied to their tender offer. LP further contends that any attempt to apply the Michigan Blue Sky Law, Mich.Comp.Laws Ann. § 451.501 *et seq.* to plaintiffs' tender offer would be likewise unconstitutional. In this action, LP seeks preliminary and permanent injunctive relief enjoining defendants from attempting to apply the procedural and enforcement provisions of these Michigan acts to LP's tender offer. The state defendants have indicated that although they are prepared to enforce the Michigan acts as to LP's offer, they will await the decision of this court. LP represents that ENA will surely seek to enforce the Michigan acts. This matter is presently before the court on plaintiffs' motion for a preliminary injunction.

The crucial issue here is whether plaintiffs can demonstrate a likelihood of success on the merits. LP must show the likely existence of a constitutional violation causally related to the threatened action sought to be enjoined. *Wilson v. Thompson,* 593 F.2d 1375, 1384–85 (5th Cir.1979).

In alleging that the Michigan statutes are unconstitutional as applied to its tender offer, LP cites the Sixth Circuit opinion in *Martin-Marietta Corp. v. Bendix Corp.,* 690 F.2d 558 (6th Cir.1982) as controlling in this case.[1] In that decision, the Sixth Circuit held that the Take Over Act and the Blue Sky Law violated the commerce clause as applied to a tender offer by Martin Marietta for outstanding shares of Bendix Corporation. Those shares were registered with the SEC and fully governed by the Williams Act.

In assessing the precedential value of the *Martin-Marietta* decision, our initial inquiry is whether LP's tender offer, for *unregistered* securities, is subject to any provision of the Williams Act, §§ 14(d), (e). There is no dispute that § 14(d) is not applicable to LP's tender offer. The only remaining provision, § 14(e), reads as follows:

> It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, *in connection with any tender offer* or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request or invitation. (Emphasis added.)

LP contends that the language "in connection with any tender offer" renders § 14(e) applicable to its tender offer for ENA shares.

The relevant legislative history of the Williams Act indicates otherwise. Enacted in 1968 to correct a perceived gap in federal securities regulation which left cash tender offers for control blocks of equity securities completely unregulated, the act was the subject of the following discussion directed to Congress:

> The bill before you deals with stock acquisitions in three specific contexts— first, the acquisition by means of a cash tender offer of more than 10% of any class of stock, of a *publicly held company*; second, other acquisitions by any person or group of more than 10% of any class of stock of a *publicly held company*; and third, the repurchase by a corporation of its own outstanding shares.

Testimony of SEC Chairman Cohen, *Hearings on S.150 Before the Subcomm. on Securities of the Senate Comm. on Bank-*

---

1. Plaintiffs also rely on the United States Supreme Court decision of *Edgar v. MITE Corp.,* 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982), wherein the Court held that an Illinois take-over statute imposed an undue burden on interstate commerce. The tender offer in *MITE* was concerned solely with registered equity securities fully subject to the Williams Act.

*ing and Currency,* 90th Cong., 1st Sess. 32–33 (1967) (emphasis added).

Throughout various Congressional proceedings relating to the Williams Act, there appears a reoccurring analogy to the proxy rules (applicable only to registered securities). A prime example is found in this statement contained in the committee reports of both houses:

The cash tender offer is similar to a proxy contest, and the committee could find no reason to continue the present gap in the Federal securities laws which leaves the cash tender offer exempt from disclosure provisions.

S.Rep. No. 550, 90th Cong., 1st Sess. 3 (1967); H.R.Rep. No. 1711, 90th Con., 2d Sess. 3 (1968), U.S.Code Cong. & Admin. News 1968, 2811, 2813.

It is clear from these passages that Congress intended that the Williams Act provisions be applicable to tender offers for registered equity securities. Moreover, a recent extensive review of the act's legislative history by Professor Alfred P. Conrad yields the conclusion that no senator or congressman was conscious of a difference in coverage between § 14(e) and any other subsections of the Williams Act. *See* Conard, *Tender Offer Fraud: The Secret Meaning of Subsection 14(e),* 40 Bus.Law 87, 89–93 (Nov. 1984).

Further evidence of legislative intent can be gleaned by comparison of the phrasing of § 14(e) with that of § 10(b) of the 1934 Act, where Congress expressly stated that the section applies to the

purchase or sale of any security registered on a national securities exchange *or any security not so registered.*

15 U.S.C. § 78j(b) (emphasis added).

If Congress had intended to apply § 14(e) tender offers to unregistered securities, it would have used this type of language in that section. Moreover, to interpret § 14(e) broadly would render an absurd result by extending coverage of its provisions to foreign and totally intrastate tender offers, as well as those made for the securities of

closely held corporations.[2] That Congress would intend for only one subsection of an extensive regulatory scheme to have this cosmic scope defies logic. The court would suggest that Congress' choice of the phrase "any tender offer" was intended to refer to the form tender offers take— whether for cash or securities, for all or a portion of the outstanding shares, and the type of transmittal through which the tender offer is made.

■ We conclude that the scope of § 14(e) is limited to tender offers for registered equity securities, made by means of interstate commerce, the mails, or national securities exchanges. In so concluding, the court is mindful of the SEC's broad interpretation of § 14(e), which suggests that the provision governs tender offers for non-registered securities. Having failed to glean any legislative intent for such an interpretation, however, we find that the commission was acting beyond its statutory authority. Accordingly, we give no weight to the SEC's interpretation.

As LP's tender offer for ENA's unregistered securities is not governed by the Williams Act, LP's reliance on the *Martin-Marietta* decision is misplaced. Implicit throughout Judge Kennedy's opinion is that Bendix shares were registered with the SEC, that the *Martin-Marietta* tender offer was fully subject to the requirements of the Williams Act, and, accordingly, that Bendix shareholders were afforded the protection of the federal securities laws, rules and regulations:

We find that to the extent that the state statutes confer power on state authorities to interfere with the timing of *an interstate tender offer made under the Williams Act,* or to compel the revision of the solicitation or tender offer as a condition of proceeding, they impose an unconstitutional burden on interstate commerce. 690 F.2d at 565 (emphasis added).

---

**2.** The number of closely held corporations in the United States is presently over three million, as compared with approximately seven thousand equity securities registered under the 1934 Act. U.S. Statistical Abstract 1984, at 532; I.R.S. SOI Bulletin, Winter 1983–84, at 23.

Because *Martin-Marietta* deals with a tender offer made for registered securities, fully governed by the Williams Act, that decision has no application here.

■ Finally, we must address whether, despite the absence of any applicable federal law, the Take Over Act has an undue burden on interstate commerce; i.e., beyond that necessary to protect a legitimate state interest. A state statute must be upheld if it "regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental ... unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970).

An examination of the major features of the Take Over Act is in order. On its face, the act applies to offers to acquire equity securities of corporations with more than 100 shareholders, either incorporated in or having their principal place of business in Michigan. Excepted from the provisions are "friendly" tender offers, i.e., either approved by incumbent management or self tenders by the corporation itself. Section 451.904(2)(d), (f). The act requires the offeror to file a registration statement with the Department of Commerce (department) ten days prior to commencement of any offer. Section 451.905(3). The department is empowered to stay the effectiveness of the offer if it orders a hearing to consider a violation of the act. Section 451.905(4). The department may issue cease and desist orders, § 451.914(1), and refer violations to the attorney general and/or local prosecutors. The act also affords target companies standing to seek enforcement.

The act also requires that a tender offer be open for not less than 60 days. Additionally, if the price or consideration is increased, it is considered as a new offer, subject to being kept open for an additional 60 days, limited by a 90-day cap. During this time period, the offeror may not purchase shares from Michigan shareholders.

The offeror may still purchase shares during this period from non-Michigan shareholders. Section 451.904(2). The act contains anti-fraud requirements that are quite similar to the provisions of § 14(e) of the Williams Act. Section 451.905.

■ The protection of resident shareholders of a Michigan corporation is a legitimate state interest.[3] This is particularly true in the absence of any applicable federal regulation and under the facts of this case. The ENA is a closely held corporation with 50 percent of its shares and shareholders located in Michigan. The corporation owns a major newspaper that impacts upon the entire state and two radio stations in Michigan's largest city. Each of these factors underscore the need for regulation of a hostile tender offer. These state interests outweigh the incidental burden the application of the Take Over Act will have on interstate commerce. We are loathe to deny enforcement of a state regulatory statute under the circumstances apparent here.

Thus, we conclude that Congress never intended § 14(e) to apply to tender offers for unregistered securities; that when Congress enacted the Williams Act, it declined an opportunity to amend § 28(a), the scope section that preserves the jurisdiction of state agencies performing like functions over unregistered securities, so long as the actions of state regulatory agencies do not conflict with provisions of the federal act; that Congress has made clear its willingness to leave the states free to regulate tender offers for unregistered securities and to tolerate the burden on interstate commerce, if any, such state regulations may cause; that the SEC's contrary interpretation is more expansive than the act will permit; that the Michigan acts are not unconstitutional on their face or as applied to the LP tender offer for the shares in ENA.

Having so concluded, LP cannot succeed on the merits of their claim of entitlement to injunctive relief, the only relief LP

---

**3.** In *Martin-Marietta,* Judge Kennedy acknowledged that the protection of Michigan share-holders is a legitimate state interest. 690 F.2d at 566.

seeks. Accordingly, plaintiffs' complaint must be dismissed.[*]

IT IS SO ORDERED.

---

[*] The court has examined plaintiffs' amended complaint filed moments before the completion of this opinion. We hold that our findings and conclusion apply to the amended complaint as well.