772 F.2d 201
 Blue Sky L. Rep. P 72,290, Fed. Sec. L. Rep. P 92,271
L.P. ACQUISITION COMPANY, et al., Plaintiffs-Appellants,
v.
Carl L. TYSON, Acting Director of the Corporation and
Securities Bureau of the Department of Commerce of
the State of Michigan, et al.,
Defendants-Appellees.
 No. 85-1640.
 United States Court of Appeals,
Sixth Circuit.
 Argued Aug. 20, 1985.
Decided Aug. 26, 1985.
 
 John C. Elam, Vorys, Sater, Seymour & Pease, Columbus, Ohio, Michael W. Schwartz, argued, Wachtell, Lipton, Rosen & Katz, New York City, for plaintiffs-appellants.
 Diane Sanger, Asst. Gen. Counsel, S.E.C., Washington, D.C., for amicus curiae (SEC).
 William Saxton, Butzel, Long, Gust, Klein & Van Zile, Phillip Kessler, argued, Detroit, Mich., Joe Sutton argued, (Kelley, Ross & Tyson) Asst. Atty. Gen., Lansing, Mich., for defendants-appellees.
 Before MERRITT, MARTIN and CONTIE, Circuit Judges.
 PER CURIAM.
 
 
 1
 Plaintiffs L.P. Acquisition Company and L.P. Media, Inc. appeal from a judgment of the district court denying their motion for a preliminary injunction and dismissing their complaint challenging the constitutionality of the Michigan Take-Over Offers Act, M.C.L.A. Secs. 451.901-917, and the Michigan Uniform Securities Act, M.C.L.A. Secs. 451.501-818, pursuant to 28 U.S.C. Secs. 1331(a), 1337(a), 2201. We reverse.
 
 I.
 
 2
 On July 29, 1985, plaintiffs L.P. Acquisition Company and L.P. Media, Inc. (hereinafter L.P.) filed a motion in the United States District Court for the Eastern District of Michigan against defendants Carl L. Tyson, Acting Director of the Corporation and Securities Bureau of the Department of Commerce of the State of Michigan; Frank J. Kelley, Attorney General of the State of Michigan; Doug Ross, Director of the Department of Commerce of the State of Michigan; and the Evening News Association (ENA), a Michigan corporation, seeking to enjoin defendants from enforcing M.C.L.A. Secs. 451.501-818, et seq., 451.901-917.
 
 
 3
 The first amended complaint, filed August 6, 1985, alleged that L.P. Acquisition and L.P. Media were incorporated on July 26, 1985 for the purpose of acquiring ENA, and that L.P. Acquisition, a Delaware corporation, is a wholly owned subsidiary of L.P. Media. The complaint alleged that L.P. Acquisition had commenced a cash tender offer for any and all of the approximately 450,000 shares of ENA from ENA's 333 shareholders for $1,000 per share. An examination of the tender offer transmitted to shareholders reveals that the offer was not conditioned upon any minimum number of shares being tendered. The complaint further alleged that about half of the shareholders were Michigan residents with about half of the shares being owned by Michigan residents. The offer was due to expire on August 23, 1985. L.P. also alleged that "ENA shares are not listed on any registered securities exchange or widely traded on the over-the-counter market."
 
 
 4
 In the complaint, L.P. admitted that it had not complied with all the provisions of Michigan's securities laws, but had filed copies of the tender offer documents with the Michigan Department of Commerce without prejudice to its claims that the Act is unconstitutional. In Count I, L.P. alleged that the Michigan statute violated the Commerce Clause, U.S. Constitution Art. I Sec. 8 cl. 3. Specifically, L.P. cited the requirement that L.P. file a registration statement with respect to the tender offer, the fact that the statute empowers Michigan officials to enjoin the sale and purchase of securities pursuant to the terms of the tender offer, and the expense incurred by L.P. in litigating the applicability of the statute. L.P. asserted that the statute was a direct burden on the free flow of interstate commerce to the extent it hindered the sale of securities by a non-Michigan seller to a non-Michigan buyer, and that the statute indirectly burdened interstate commerce because the burdens on interstate commerce outweighed the benefits the state sought from the statute. In Count II, L.P. asserted that the Michigan statute violated the Supremacy Clause to the extent that it delayed the purchase and sale of securities past the 20-day minimum period established by 17 C.F.R. Sec. 240.14e-1(a), promulgated pursuant to 15 U.S.C. Sec. 78n(e). In Count III, L.P. challenged the M.C.L.A. Sec. 451.808, as unconstitutional as applied to interstate transactions, and, in Count IV, alleged that ENA had violated 15 U.S.C. Sec. 78n(e).
 
 
 5
 L.P. sought a temporary restraining order, a preliminary injunction, and a permanent injunction restraining defendants from attempting to enforce the Michigan statutes and enjoining ENA from making further misleading statement about the L.P. tender offer. L.P. also sought a declaratory judgment that the statutes are unconstitutional as applied. The motion for a temporary restraining order was accompanied by an affidavit from L.P. Media counsel Grover C. Cooper representing that application of the Michigan statute would delay FCC approval for the transfer of control of the ENA licenses as parent of a number of FCC media facilities.
 
 
 6
 On August 7, 1985, 616 F.Supp. 1186, the district court entered judgment denying injunctive relief and dismissing the complaint. The court order represented that "[t]he state defendants have indicated that although they are prepared to enforce the Michigan acts as to L.P.'s offer, they will await the decision of this court. L.P. represents that ENA will surely seek to enforce the Michigan acts." The court disposed of L.P.'s Supremacy Clause and fraud claims (Counts II and III) by finding that 15 U.S.C. Sec. 78n(e) of the Williams Act only applied to registered securities. The court held that
 
 
 7
 to interpret Sec. 14(e) broadly would render an absurd result by extending coverage of its provisions to foreign and totally intrastate tender offers, as well as those made for the securities of closely held corporations. That Congress would intend for only one subsection of an extensive regulatory scheme to have this cosmic scope defies logic. The court would suggest that Congress' choice of the phrase "any tender offer" was intended to refer to the form tender offers take--whether for cash or securities, for all or a portion of the outstanding shares, and the type of transmittal through which the tender offer is made.
 
 
 8
 (footnote omitted). With respect to L.P.'s Commerce Clause challenge, the court held:
 
 
 9
 The protection of resident shareholders of a Michigan corporation is a legitimate state interest. This is particularly true in the absence of any applicable federal regulation and under the facts of this case. The ENA is a closely held corporation with 50 percent of its shares and shareholders located in Michigan. The corporation owns a major newspaper that impacts upon the entire state and two radio stations in Michigan's largest city. Each of these factors underscore the need for regulation of a hostile tender offer. These state interests outweigh the incidental burden the application of the Take Over Act will have an interstate commerce.
 
 
 10
 (footnote omitted). The court found further support in its findings that 17 C.F.R. Sec. 240.14e-1(a) is inapplicable to the ENA unregistered securities and that Congress, in enacting the Williams Act, had not changed the provisions of 15 U.S.C. Sec. 78bb(a) which reserved some regulatory power for the states.
 
 
 11
 On August 7, 1985, L.P. moved for an expedited appeal and a preliminary injunction pending appeal, and on August 20, 1985, we heard argument in the case. L.P. appealed pursuant to 28 U.S.C. Secs. 1291, 1292(a)(1). At oral argument, counsel for L.P. represented that the tender offer had been increased to $1,250 per share and that the offer would expire August 30, 1985. Counsel also represented that this offer was subject to the condition that none of the tendered shares would be purchased unless more than half of the shares were tendered.II.
 
 
 12
 Prior to consideration of the constitutional issues argued before us, we review the scope of the statute in issue. M.C.L.A. Sec. 451.903(4) defines "target company" as an issuer of securities which may be the subject of a take-over offer. The statute defines "take-over offer" as an offer directed at an issuer who either is "organized under the laws of this state" or has "its principal place of business in this state" and where acceptance of the offer would make the offeror "a beneficial owner of more than 5% of the outstanding shares of the class of the security offered or acquired." M.C.L.A. Sec. 451.904(1). However, excluded from the definition of "take-over offer" are (1) "an offer made to not more than 15 persons in this state during any 12 consecutive months," (2) "an offer made by a person other than an issuer which is initiated or approved by the board of directors of the issuer of the security which is the subject of the offer if the offer is made when a take-over offer with respect to the security by another person is not effective or was not publicly disclosed under section 3," and (3) an offer "[b]y the issuer of the security." Section 451.904(2)(a), (d), (f).
 
 
 13
 An offer may not be made unless it is "effective" or "exempt." Section 451.905(1). An offer becomes "effective" 10 days after the offeror files a registration statement with the department of commerce, delivers the statement to the target company, and publicly discloses the terms of the offer. Section 451.905(3). Once the offer becomes "effective" "it shall remain open for acceptance by the offerees for not less than 60 days." Section 451.905(2). The effective date is stayed if the administrator, the department of commerce, section 451.902(1), "orders a hearing for an alleged violation of this act." Section 451.905(4). The hearing must be held not more than 20 days after filing of the registration statement and a "summary determination" is to be made within 20 days after the hearing. Section 451.907(1), (2), (4). "The administrator may summarily order the delay of the effective date of the offer if the administrator determines that the registration statement ... does not provide full disclosure to offerees of all material information concerning the offer." Section 451.908(3).
 
 
 14
 The contents of the registration statement required by the Michigan act are virtually identical to the information required to be disclosed to shareholders by the Williams Act, 15 U.S.C. Sec. 78n(d). M.C.L.A. Sec. 451.908(1). The statute further contains anti-fraud provisions which are identical to the anti-fraud provisions of the Williams Act, 15 U.S.C. Sec. 78n(e). M.C.L.A. Sec. 451.910. See also M.C.L.A. Sec. 451.911(3)(a).
 
 
 15
 The statute prohibits offerors from acquiring shares from residents of the state while administrative proceedings are pending, M.C.L.A. Sec. 451.911(2), and provides that "[a]n offeror may not make a take-over offer which is not made to security holders in this state on substantially the same terms as the offer is made to security holders outside this state," section 451.911(1). With respect to exemptions, the statute provides:
 
 
 16
 The administrator may by rule or order exempt from this act takeover offers that it determines are not made for the purpose, or do not have the effect of, changing or influencing the control of a target company or where compliance with this act is not necessary for the protection of the offerees, and may similarly exempt persons from the filing of registration statements under this act.
 
 
 17
 M.C.L.A. Sec. 451.912(1).
 
 
 18
 The statute empowers the administrator to issue cease and desist orders and to enforce those orders in state court. M.C.L.A. Sec. 451.914. The statute also allows the target company to seek injunctive relief with respect to violations of the statute. Section 451.917(2). In this case, of course, neither the administrator nor the target company has taken action pursuant to the statute, but have announced their intention to do so should the statute pass constitutional muster.III.
 
 
 19
 Our review of a district court's denial of a preliminary injunction is limited to determining whether the district court abused it discretion. Christian Schmidt Brewing v. G. Heileman Brewing, 753 F.2d 1354, 1356 (6th Cir.1985). "A district court abuses its discretion ... when it improperly applies the law...." Id.
 
 
 20
 There are four factors to be considered in determining whether the grant or denial of a preliminary injunction was an abuse of discretion: (a) the likelihood of success on the merits of the action, (b) the irreparable harm which could result without the relief requested, (c) the impact on the public interest, and (d) the possibility of substantial harm to others.
 
 
 21
 Id.; Martin-Marietta Corp. v. Bendix Corp., 690 F.2d 558, 564 (6th Cir.1982). "To show a likelihood of prevailing on the merits, the appellant must show the likely existence of a constitutional violation casually related to the result sought to be enjoined." Id. at 565. Accordingly, we consider in turn L.P.'s likelihood of success in its challenges to the Michigan statute.
 
 A.
 
 22
 Article I Sec. 8, cl. 3 of the U.S. Constitution provides that "[t]he Congress shall have Power ... To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." Of course, "[i]n the absence of conflicting federal legislation, the States retain authority under their general police powers to regulate matters of 'legitimate local concern,' even though interstate commerce may be affected." Lewis v. BT Investment Managers, Inc., 447 U.S. 27, 36, 100 S.Ct. 2009, 2015, 64 L.Ed.2d 702 (1980). The Court has applied a rule of per se invalidity to state legislation which effects simple economic protectionism. Id. However, where the challenged legislation indirectly burdens interstate commerce, a different rule applies.
 
 
 23
 Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.... If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.
 
 
 24
 Id. at 36-37, 100 S.Ct. at 2015, 2016 (quoting Pike v. Bruce Church, Inc., 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970)); Metropolitan Life Ins. Co. v. Ward, --- U.S. ----, ----, 105 S.Ct. 1676, 1683, 84 L.Ed.2d 751 (1985); Bacchus Imports, Ltd. v. Dias, --- U.S. ----, 104 S.Ct. 3049, 3055, 82 L.Ed.2d 200 (1984). "The principal focus of the inquiry must be the practical operation of the statute, since the validity of state laws must be judged chiefly in terms of their probable effects." Lewis, 447 U.S. at 37, 100 S.Ct. at 2016.
 
 
 25
 We believe that the Michigan statute is not violative of the Commerce Clause because the state is regulating in an area reserved to the states by federal securities legislation. Further, even absent the Congressional authorization to regulate, the benefits arising from the state's promotion of its legitimate interest in protecting resident shareholders outweighs the burdens the statute places on interstate commerce.
 
 
 26
 15 U.S.C. Sec. 78bb(a) provides in pertinent part that "[n]othing in this chapter shall affect the jurisdiction of the securities commission ... of any State over any security or any person insofar as it does not conflict with the provisions of this chapter or the rules and regulations thereunder." It is clear that Congress " 'may redefine the distribution of power over interstate commerce' by 'permit[ting] the states to regulate the commerce in a manner which would otherwise not be permissible.' " South-Central Timber Development, Inc., 467 U.S. 82, 104 S.Ct. 2237, 2240, 81 L.Ed.2d 71 (1984) quoting Southern Pacific Co. v. Arizona, 325 U.S. 761, 65 S.Ct. 1515, 89 L.Ed.2d 1915 (1945); New England Power Co. v. New Hampshire, 455 U.S. 331, 340-41, 102 S.Ct. 1096, 1101, 71 L.Ed.2d 188 (1982); Lewis, 447 U.S. at 44, 100 S.Ct. at 2019, 2020. While the Court has generally required an express statement of Congressional policy to allow otherwise impermissible regulation of interstate commerce, "[t]here is no talismanic significance to the phrase 'expressly stated', however; it merely states one way of meeting the requirement that for a state regulation to be removed from the reach of the dormant Commerce Clause, congressional intent must be unmistakably clear." South-Central Timber, 467 U.S. at ----, 104 S.Ct. at 2242.
 
 
 27
 This is not a case where the state seeks to regulate tender offers for which the Congress has already provided disclosure requirements nor has Congress "remained completely silent on the subject" of state regulation. Northeast Bancorp, Inc. v. Board of Governors, --- U.S. ----, 105 S.Ct. 2545, 2554, 86 L.Ed.2d 112 (1985) ("When Congress so chooses, state actions which it plainly authorizes are invulnerable to constitutional attack under the Commerce Clause."). The parties admit that the securities at issue here are not registered, and, therefore, the disclosure requirements of 15 U.S.C. Sec. 78n(d) are inapplicable. The Court has indicated that 15 U.S.C. Sec. 78bb(a) indicates "the intent of Congress that state law continues to apply where the Act itself does not." Merrill Lynch, Pierce, Fenner & Smith v. Ware, 414 U.S. 117, 138 n. 16, 94 S.Ct. 383, 395 n. 16, 38 L.Ed.2d 348 (1973); Leroy v. Great Western United Corp., 443 U.S. 173, 182, 99 S.Ct. 2710, 2716, 61 L.Ed.2d 464 (1979) ("That section [15 U.S.C. Sec. 78bb(a) ] was plainly intended to protect, rather than to limit, state authority." (footnote omitted)). Justice Powell's concurring opinion in Edgar v. MITE Corp., 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982) indicates that the interplay between the Commerce Clause and the Williams Act "leaves some room for state regulation of tender offers." Id. at 646, 102 S.Ct. at 2642. It is clear that Justice Powell was referring to situations such as this in which an out-of-state offeror seeks to takeover an in-state corporation. Justice Powell commented that "[i]nevitably there are certain adverse consequences in terms of general public interest when corporate headquarters are moved away from a city and State." Id. at 646, 102 S.Ct. at 2643 (footnote omitted) (emphasis added). Accordingly, we believe that through the Williams Act and 15 U.S.C. Sec. 78bb(a) Congress intended to reserve for the states regulation of securities and tender offers which Congress clearly declined to regulate.
 
 
 28
 Alternatively, we find no undue burden on interstate commerce in violation of the Commerce Clause. Although appellants argue that the Michigan statute impermissibly exempts the issuer from the statute's disclosure requirements, we perceive no discrimination that has characteristically invalidated state statutes. The statute does not favor Michigan offerors over foreign offerors and only prohibits as offeror from acquiring the securities of state residents during the pendency of state proceedings pursuant to the statute. M.C.L.A. Sec. 451.911(2). Accordingly, we do not perceive the statute as constitutionally infirm on the basis of impermissible protectionist intent or effect.
 
 
 29
 In balancing the burdens and benefits of the statute pursuant to the standards set out in Pike, supra, we are guided by the decisions in MITE and Martin-Marietta. In Martin-Marietta, this court held the same Michigan statute unconstitutional as applied to a tender offer subject to the disclosure requirements of 15 U.S.C. Sec. 78n(d). Following MITE, the court found the statute unconstitutional to the extent that it interfered with the timing of a tender offer under the Williams Act and to the extent that the state attempted to compel revision of the offer. 690 F.2d at 565. With respect to the burdens that the Michigan statute places on interstate commerce, we are bound by the characterizations of Martin-Marietta. The court found commerce burdened by the registration statement requirement, and the cost and time of litigation under the statute, and, due to the conditional nature of the tender offer, the statute defeated "the tender offers of residents from other states where the tendered shares owned by Michigan residents are needed to provide sufficient tendered shares to satisfy the tender offer." Id. at 566-67. In this case, the parties represent that about half of the ENA shares are owned by Michigan residents. While the basis for this belief is not clear, there, of course, is nothing impeding any shareholder from either changing residency or selling his shares in the course of this litigation. Assuming, however, that the 50/50 estimate is accurate, L.P. would be required to obtain tenders from all of the shares of non-Michigan shareholders. Clearly, this places some burden on interstate commerce. See MITE, 457 U.S. at 643, 102 S.Ct. at 2641.
 
 
 30
 However, the weight of the benefits in this case differs from MITE and Martin-Marietta. While we recognize that "there exists no legitimate state interest in the protection of non-resident shareholders," Martin-Marietta, 690 F.2d at 566, both MITE and Martin-Marietta, unlike the pending case, involved tender offers subject to section 14(d) of the Williams Act. Accordingly, in the absence of the federal disclosure requirements, the state's interest in protecting resident shareholders is enhanced. In MITE, the Court found that the benefits provided by the Illinois statute to resident shareholders were speculative because "the Williams Act provides these same substantive protections," and the requirements of the Illinois statute "which go beyond those mandated by the Williams Act and the regulations pursuant to it may not substantially enhance the shareholders' ability to make informed decisions." 457 U.S. at 644-45, 102 S.Ct. at 2642. In contrast, the benefits to resident shareholders from the Michigan statute are great since the disclosure requirements of the Williams Act are inapplicable in this case. Therefore, the state statute, unlike the statutes in MITE and Martin-Marietta, provides for disclosure in the first instance rather than merely enhancing the foundation of federal disclosure mandates. Justice Powell's concurrence eloquently articulates the state's compelling interest in protecting its residents.
 
 
 31
 The corporate headquarters of the great national and multinational corporations tend to be located in the large cities of a few States. When corporate headquarters are transferred out of a city and State into one of these metropolitan centers, the State and locality from which the transfer is made inevitably suffer significantly. Management personnel--many of whom have provided community leadership--may move to the new corporate headquarters. Contributions to cultural, charitable, and educational life--both in terms of leadership and financial support--also tend to diminish when there is a move of corporate headquarters.
 
 
 32
 Id. at 646, 102 S.Ct. at 2642, 2643. Accordingly, we hold that, under the facts of this case, the Michigan statute does not violate the Commerce Clause.
 
 B.
 
 33
 Appellants argue that under the Supremacy Clause, Section 14(e) of the Williams Act, 15 U.S.C. Sec. 78n(e), preempts the timing provisions of the Michigan statute. Specifically, appellants rely on 17 C.F.R. Sec. 240.14e-1(a) and the policy of avoiding delay in order to maintain a balance of power between the offeror and the target company.
 
 
 34
 A state statute is preempted by federal law where (1) "compliance with both federal and state regulations is a physical impossibility," Florida Lime and Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-43, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963), or (2) when "the purpose of the federal statute would to some extent be frustrated by the state statute," Colorado Anti-Discrimination Commission v. Continental Air Lines, Inc., 372 U.S. 714, 722, 83 S.Ct. 1022, 1026, 10 L.Ed.2d 84 (1963). "Congressional enactments which do not expressly exclude state legislation in the field nevertheless override state laws with which they might conflict." National City Lines, Inc. v. LLC Corp., 687 F.2d 1122, 1128 (8th Cir.1982).
 
 15 U.S.C. Sec. 78n(e) provides:
 
 35
 It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation. The Commission shall, for the purposes of this subsection, by rules and regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative.
 
 17 C.F.R. Sec. 240.14e-1(a) provides:
 
 36
 As a means reasonably designed to prevent fraudulent, deceptive or manipulative acts or practices within the meaning of section 14(e) of the Act, no person who makes a tender offer shall:
 
 
 37
 (a) Hold such tender offer open for less than twenty business days from the date such tender offer is first published or sent or given to security holders: Provided, however, That this paragraph (a) shall not apply to a tender offer by the issuer of the class of securities being sought which is not made in anticipation of or in response to another person's tender offer for securities of the same class.
 
 
 38
 Of course, "properly promulgated, substantive agency regulations have the 'force and effect of law.' This doctrine is so well established that agency regulations implementing federal statutes have been held to pre-empt state law under the Supremacy Clause." Chrysler Corp. v. Brown, 441 U.S. 281, 295-96, 99 S.Ct. 1705, 1714, 60 L.Ed.2d 208 (1979) (footnotes omitted).
 
 
 39
 Preliminarily, the district court found, and appellees argue, that 14(e) is not applicable to the tender offer at issue in this case, but is only applicable to registered securities. For several reasons, we reject this conclusion. First, the plain language of the statute refers to "any tender offer." (Emphasis added). Second, as the remaining subsections of 15 U.S.C. Sec. 78n demonstrate, Congress clearly knew how to limit the applicability of legislation to a particular class of tender offers when it so intended. Third, the Securities and Exchange Commission, the agency with expertise in the area, has found that "[t]he broad antifraud provisions of Section 14(e) are applicable to any tender offer." Securities Act Release No. 6022 (February 5, 1979). Fourth, the Supreme Court has described 14(e) as "a general antifraud provision," MITE, 457 U.S. at 633 n. 8, 102 S.Ct. at 2635 n. 8, and the Third Circuit has found that "[u]nlike the proxy regulations of section 14(a) and the disclosure requirements of 14(d), the anti-fraud proscriptions contained in section 14(e) apply to any class of security." E.H.I. of Florida, Inc. v. Insurance Co. of North America, 652 F.2d 310, 315 (3d Cir.1981). Accordingly, we conclude that the district court erred in construing 14(e) as inapplicable to this case.
 
 
 40
 In MITE, a plurality of the Court found that "Congress sought to protect the investor not only by furnishing him with the necessary information but also by withholding from management or the bidder any undue advantage that could frustrate the exercise of an informed choice." 457 U.S. at 634, 102 S.Ct. at 2636. Further, "the takeover bidder should be free to move forward within the time frame provided by Congress." Id. The plurality found that the 20-day pre-commencement notification provision furnishes "incumbent management with a powerful tool to combat tender offers," and, therefore, "frustrates the objectives of the Williams Act." Id. at 635, 102 S.Ct. at 2637. Further, the plurality found that "the hearing provisions of the Illinois Act frustrate the congressional purpose by introducing extended delay into the tender offer process." Id. at 637, 102 S.Ct. at 2638. "Delay has been characterized as 'the most potent weapon in a tender-offer fight.' " Id. at n. 12. Further, the SEC has found, in establishing a 20-day minimum period for which offers should be held open, that national uniformity in this area is desirable. Securities Act Release No. 6022 (February 5, 1979). The Eighth Circuit has likewise found that "[s]tate statutes which can be used to unduly delay tender offers are preempted by the Williams Act." National City Lines, 687 F.2d at 1131.
 
 
 41
 The Michigan statute, much like the Illinois statute in MITE, frustrates the congressional purpose of maintaining a balance between the target company and the offeror. The pre-commencement notification provision, the hearing scheme, and the 60-day minimum period for holding the offer open all impermissibly delay the offer and aid management in fighting off the take-over. This frustrates the purposes of the Williams Act as expressed in 15 U.S.C. Sec. 78n(e) and 17 C.F.R. Sec. 240.14e-1(a). Accordingly, to the extent these procedures conflict with the 20-day minimum period of Rule 14e-1(a), they are preempted by federal law. We do not hold that a state might never establish a hearing scheme to inquire into the adequacy of an offeror's disclosures. However, whatever scheme a state devises must operate within the confines of congressional intent expressed through the federal securities laws and regulations. Accordingly, we find that appellants have established a likelihood of success on the merits.
 
 
 42
 Our consideration of the remaining elements required for a grant of injunctive relief is largely controlled by our decision in Martin-Marietta. Appellants may suffer irreparable harm because they "are in danger of losing the opportunity, which the evenhanded operation of the Williams Act guarantees them, to attempt to acquire [ENA] stock. Such loss could not be compensated by money damages." Martin-Marietta, 690 F.2d at 568. Further, balancing the irreparable harm threatened to L.P. against the harm potentially suffered by defendants favors the granting of injunctive relief. The state has no legitimate interest in enforcing laws which frustrate federal securities regulation. Finally, the public interest would best be served by granting relief since "the public has no interest in the enforcement of laws in an unconstitutional manner." Id.
 
 
 43
 Accordingly, we reverse the judgment of the district court and remand for entry of preliminary injunctive relief consistent with this opinion. We also vacate the district court's dismissal of L.P.'s complaint seeking permanent injunctive relief, a declaratory judgment, and injunctive relief against ENA for violations of 15 U.S.C. Sec. 78n(e), and remand the case for further proceedings.
 
 
 44
 CONTIE, Circuit Judge, concurring in part, dissenting in part.
 
 
 45
 I concur in Parts I, II, and IIIB of the court's opinion and agree that preliminary injunctive relief is warranted because of the conflict between the Michigan statute and the Williams Act. However, finding no principled distinctions between this case and the decisions in MITE and Martin-Marietta, I dissent from the court's disposition of appellants' Commerce Clause challenge and would grant preliminary injunctive relief to enjoin application of the Michigan statute due to its constitutional infirmities. The fact that the tender offer in this case, unlike those in MITE and Martin-Marietta, was not subject to Section 14(d) of the Williams Act since the securities are not registered pursuant to 15 U.S.C. Sec. 781 does not require a different result in this case.